# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-IA-01728-SCT

*MISSISSIPPI HIGH SCHOOL ACTIVITIES ASSOCIATION, INC.*

*v.*

*R.T. A MINOR, BY AND THROUGH HIS NATURAL FATHER AND NEXT FRIEND, RICHARD R. TRAIL*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/09/2013 |
| TRIAL JUDGE: | HON. VICKI B. COBB |
| TRIAL COURT ATTORNEYS: | STEVEN E. FARESE, SR. |
| | JOHN JEFFREY TROTTER |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | BENJAMIN BLUE MORGAN |
| | JAMES A. KEITH |
| | JOHN JEFFREY TROTTER |
| | J. KEITH TREADWAY |
| ATTORNEYS FOR APPELLEE: | STEVEN E. FARESE, SR. |
| | JOSEPH WHITTEN COOPER |
| | NORMAN WILLIAM PAULI, JR. |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED AND REMANDED - 05/08/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC**

**DICKINSON, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     The only issue before us is whether a high school athlete has standing to challenge

adverse decisions concerning the student's eligibility to participate in high school athletics.

We hold that he does.

## FACTS AND PROCEDURAL HISTORY

¶2.     The DeSoto County School District ("School District")—a public, taxpayer-funded entity—entered into a contract with a private entity called the Mississippi High School Activities Association ("MHSAA").[1]  The terms of the contract allow MHSAA to decide whether School District students are eligible to play high school sports.  In making its decisions, MHSAA applies its own rules and regulations, and neither the School District nor its school board have input into the process.

¶3.     In 2012, R.T. was a star quarterback for Wynne Public School in Wynne, Arkansas. His parents—the Trails—decided that a change of school districts would be in R.T.'s best interests, so in January 2013 they bought a house in Olive Branch and enrolled R.T. in Olive Branch High School.  Their daughter was to remain in Wynne until the school year ended. MHSAA determined that R.T. was eligible to compete in spring sports and allowed R.T. to play baseball.  MHSAA conditioned R.T.'s continuing eligibility on the Trails' daughter also enrolling in the School District at the start of the 2013-2014 school year.  But, because the Trails' daughter did not want to leave her friends behind in Arkansas, the family decided that one parent would stay in Arkansas with their daughter, as they had done during the spring semester, and the other parent would move to Mississippi and remain with R.T.

¶4.     On the eve of the 2013 football season, MHSAA notified the school and R.T. that, under its interpretation of its rules and regulations, R.T. was ineligible to play because it had

---

[1] The contract between the school and MHSAA consists of an annual membership form that the school is required to complete and return to MHSAA, pursuant to section 3.4.1 of the MHSAA Handbook, and the MHSAA Handbook, itself.  *See* footnote 9 and accompanying text below.

determined that his family had not made a bona fide move to the School District.[2] Neither the School District nor Olive Branch High School appealed through MHSAA's internal procedure, so the Trails immediately filed a petition for a temporary restraining order (TRO) and preliminary injunction in the DeSoto County Chancery Court. The chancellor signed an ex-parte order granting the TRO and revoking MHSAA's adverse eligibility determination.

¶5.    MHSAA then filed a motion to dismiss under Mississippi Rule of Civil Procedure 12(b)(6) arguing that the Trails lacked standing to challenge MHSAA's eligibility determinations and that the Trails' action was premature. The Trails argued that R.T. had standing as a third-party beneficiary to the contract between MHSAA and the School District. The chancellor granted MHSAA's motion to dismiss all claims against the MHSAA and the DeSoto County School District and dissolved the original injunction, finding that the Trails lacked standing because "[t]he Mississippi Supreme Court has held that participation in high school athletics is not a legally enforceable right." However, the chancellor granted the Trails' motion for a stay while the Trails appealed the chancery court's order dissolving their injunction and dismissing their case.

¶6.    The Trails then filed a motion under Mississippi Rule of Civil Procedure 59(c) to amend the chancellor's order, arguing that the chancery court was the "only bastion [of] relief for the kids" who had been affected by adverse eligibility determinations, and that R.T. had standing as a third-party beneficiary to the contract between the School District and

_____

[2] The MHSAA's byzantine eligibility requirements are codified in Part II, Section 2 of the MHSAA's handbook.

MHSAA. In the interim, MHSAA twice petitioned this Court for writs of prohibition and mandamus and a petition for permission to file an interlocutory appeal.

¶7. After we directed the chancellor to rule on the Trails' still-pending Rule 59(e) motion, the chancellor granted the motion finding that the Trails had standing, because R.T. was a direct beneficiary of the hardship provisions of the contract between MHSAA and the School District. The chancellor converted the TRO into a preliminary injunction. MHSAA yet again filed a petition for permission to file an interlocutory appeal in this Court, which we granted in order to finally settle the issue.

## ANALYSIS

¶8. This Court reviews questions of law, including questions of standing and the existence of legally cognizable claims, de novo.[3] Mississippi's standing requirements—unlike the standing requirements in federal court—are quite liberal.[4] "Parties have standing to 'sue or intervene when they assert a colorable interest in the subject matter of the litigation or *experience an adverse effect* from the conduct of the defendant, or as otherwise authorized by law.'"[5] But our liberal standing requirements are not without bounds:

> [A]n individual's legal interest or entitlement to assert a claim against a defendant must be grounded in some legal right recognized by law, whether

---

[3] *See, e.g.*, *Children's Med. Grp., P.A. v. Phillips*, 940 So. 2d 931, 933 (Miss. 2006) (citing *Webb v. DeSoto Cnty.*, 843 So. 2d 682, 684 (Miss. 2003)) ("[W]e review de novo the denial of a motion to dismiss for failure to state a claim.").

[4] *Dunn v. Miss. Dep't of Health*, 708 So. 2d 67, 70 (Miss. 1998) (citing *Fordice v. Bryan*, 651 So. 2d 998, 1003 (Miss. 1995)) ("Mississippi's standing requirements are quite liberal.").

[5] *Dunn*, 708 So. 2d at 70 (quoting *Fordice*, 651 So. 2d at 1003) (emphasis added).

4

by statute or by common law. Quite simply, the issue adjudicated in a standing case is whether the particular plaintiff had a right to judicial enforcement of a legal duty of the defendant or . . . whether a party plaintiff in an action for legal relief can show in himself a present, existent actionable title or interest, and demonstrate that this right was complete at the time of the institution of the action.[6]

¶9. Under the Restatement (Second) of Contracts, "a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . . the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."[7] In one of our older cases we articulated a three-part test to determine when a third party qualifies as an intended beneficiary:

> (1) [w]hen the terms of the contract are expressly broad enough to include the third party either by name as one of a specified class, and (2) the said party was evidently within the intent of the terms so used, the said third party will be within its benefits, if (3) the promissee had, in fact, a substantial and articulate interest in the welfare of the said third party in respect to the subject of the contract.[8]

¶10. In this case, the MHSAA Handbook—which forms part of the contract between MHSAA and its member schools—declares that its purpose "is to promote the general

---

[6] *City of Picayune v. S. Reg'l Corp.*, 916 So. 2d 510, 526 (Miss. 2005) (citing *State v. Quitman Cnty.*, 807 So. 2d 401, 405 (Miss. 2001); *Am. Book Co. v. Vandiver*, 181 Miss. 518, 178 So. 598 (1938)).

[7] *Restatement (Second) of Contracts* § 302 (1981); *see also Simmons Housing, Inc. v. Shelton ex rel. Shelton*, 36 So. 3d 1283, 1286 (Miss. 2010) (citing *Burns v. Washington Savings*, 251 Miss. 789, 796, 171 So. 2d 322, 325 (1965)) ("Third-party-beneficiary status arises from the terms of the contract.").

[8] *Yazoo & M.V.R. Co. v. Sideboard*, 161 Miss. 4, 133 So. 669, 671 (1931) (citing *Smyth v. City of New York*, 96 N.E. 409 (N.Y. 1911)).

welfare of member schools in their relations with each other."[9]  This artfully drafted statement of purpose carefully avoids any mention of student athletes.  But MHSAA's bylaws governing student-athlete eligibility make clear that the "[e]ligibility rules shall apply to all *students* participating in interscholastic athletic competition in all activities/athletics at all levels of play, including middle school."

¶11.    Under our three-part *Sideboard* test, we first look at whether "the terms of the contract are expressly broad enough to include the third party . . . by name."[10]  This first requirement is met because students are expressly mentioned by name in MHSAA's eligibility rules.

¶12.    Second, we determine whether the third-party "was evidently within the intent of the terms so used."[11]  If so, "the said third party will be within its benefits."[12]  Clearly the student athletes are within the intent of MHSAA's eligibility rules and within the benefits of those rules.  After all, students who are ruled eligible are allowed to play sports, and those who are ruled ineligible are not.

¶13.    And finally, "the promisee [must have] had, in fact, a substantial and articulate interest in the welfare of the said third party in respect to the subject of the contract."[13]  We can only hope that MHSAA had the welfare of the students in mind when it drafted its eligibility

---

[9] *Miss. High School Activities Ass'n v. Farris*, 501 So. 2d 393, 396 (Miss. 1987) ("The Court looks to the handbook to see if any rights spring to appellees, or if the alleged broken conditions were placed in the handbook for the direct benefit of the appellees.").

[10] *Sideboard*, 133 So. at 671.

[11] *Id.*

[12] *Id.*

[13] *Id.*

6

requirements. It seems obvious that MHSAA's entire system of eligibility rules creates a substantial and articulate interest in the welfare of the student athletes.

¶14. So, under Mississippi's law governing third-party beneficiaries, we find that student athletes are intended beneficiaries of MHSAA's eligibility requirements. Applying our rules on intended third-party beneficiaries, it is clear that both MHSAA and its member schools intended the students to have a right to compete in athletic competitions and that the parties intended to give this benefit to high school students. The bylaws manifest an intent by both parties to create rules benefitting both member schools and student athletes. And, under our *Sideboard* three-part test, the specific procedures governing student athletes in the bylaws mean that student athletes, like R.T., are the intended beneficiaries of the contract between the MHSAA and its member schools.

¶15. Our previous decision in *Mississippi High School Activities Association v. Farris* is readily distinguishable from this case. In *Farris*, MHSAA threatened to impose sanctions and penalties *on member schools* allegedly for violating MHSAA's rules.[14] We addressed only whether high school baseball players were the intended beneficiaries of MHSAA's handbook's notice and hearing procedures that allowed the school to challenge the sanctions and penalties.[15] We held that the high school baseball players were merely incidental beneficiaries to MHSAA's notice and hearing provisions, which were intended only to

---

[14] *Farris*, 501 So. 2d at 394-95.

[15] *Id.* at 395.

7

benefit high schools facing sanctions.[16]  Here, unlike ***Farris***, the issue directly affects the student, and not merely the school.

¶16.　MHSAA's eligibility rules clearly benefit and apply to the student athletes.  Indeed, Section 2.2.2 of the eligibility bylaws states that "[i]t is a school's responsibility to educate *student-athletes*, parents, coaches, and other appropriate persons on MHSAA rules, *including eligibility rules that affect them*."  (Emphasis added.)  So the eligibility rules, by MHSAA's own language, affect student athletes.

¶17.　MHSAA's eligibility requirements touch on student age,[17] medical history,[18] behavior,[19] drug and substance use,[20] academic requirements,[21] and residency requirements.[22]

---

[16] ***Id.***

[17] Section 2.6 Age and Entry Requirements: "A student becomes ineligible for interscholastic participation if he/she has reached his/her 19th birthday before August 1 of that school year."

[18] Section 2.8 Medical History Evaluation and Examination: "Prior to tryouts or practices in the season in which he/she participates, each student shall pass a medical examination . . . ."

[19] Section 2.35 Felony: "The MHSAA Executive Committee and Legislative Council strongly recommend that any student indicted for a felony not be allowed to participate in interscholastic sports/activities during the time of indictment and/or conviction."

[20] Section 2.9 Abuse and/or Misuse of Illegal Substances: "The MHSAA recommends that each member school develop and implement a substance abuse/misuse policy, including procedures for chemical testing of student-athletes."

[21] Section 2.10 Scholastic Requirements: "The MHSAA requires students participating in MHSAA sanctioned competitions to make 'satisfactory progress toward graduation.'"

[22] Section 2.27 Bona Fide Residence: "A student must attend school in the school district in which his/her parents are bona fide residents."  Section 2.28 Bona Fide Change of Residence State: "Determination of what constitutes a bona fide change of residence shall

8

These elaborate rules clearly are designed to *benefit* student athletes. Indeed, these rules indicate that MHSAA has a "substantial and articulate interest in the welfare of the said third party in respect to the subject of the contract."[23] While MHSAA proclaims that its purpose is only to govern relations between its member schools, its rules regulating the eligibility of student athletes indicate otherwise.

¶18.    MHSAA's intent to *benefit* individual student athletes also is manifested in MHSAA's policy of sanctioning member schools any time an individual student challenges MHSAA in court and loses.[24] Under its contract with member schools, MHSAA reserves the right to sanction the member school for a student's unsuccessful litigation. This rule, which is just one part of MHSAA's elaborate eligibility rules, undermines MHSAA's claim that students do not have standing to challenge its eligibility determinations in court. All of MHSAA's eligibility rules are intended to benefit the student athletes, and student athletes have standing to challenge adverse eligibility determinations.

---

depend upon the facts of each case . . . ." And Section 2.29 Bona Fide Move Investigation states: "The MHSAA shall conduct an investigation of a bona fide move if it appears a bona fide change of residence has not been made."

[23] ***Sideboard***, 133 So. at 671.

[24] These are the same individual students who are denied any internal mechanism to challenge the MHSAA's adverse-eligibility determinations.

**CONCLUSION**

¶19. While it generally is true that high school students have no legally protected right to participate in high school athletics,[25] once a school decides to create a sports program and establish eligibility rules, the school—or as in this case, MHSAA—has a duty to follow those rules; and it may be held accountable when it does not do so. Without the students, there would be no school, no principal, no school board, no MHSAA, and no athletic program, so we find it fairly obvious that high school student-athletes are among the intended beneficiaries of high school athletic programs, and the rules that govern them—whether those rules are administered by the school, the school district, or a private entity with whom the school contracts.

¶20. And where, as here, the school delegates its authority to control student eligibility through a contract with a private entity, we hold that students directly affected by the contract are third-party beneficiaries of that contract. For us to say otherwise would run contrary to the very reason for extracurricular activities, which is to enrich the educational experience of the students.[26] Accordingly, we hold that R.T. does have standing to challenge MHSAA's

---

[25] *See* ***Nat'l Collegiate Athletic Ass'n v. Gillard***, 352 So. 2d 1072, 1081 (Miss. 1977) (quoting ***Scott v. Kilpatrick***, 237 So. 2d 652, 655 (Ala. 1970)) ("Participation in high school athletics is an extra-curricula activity subject to regulations as to eligibility. Engaging in these activities is a privilege which may be claimed only in accordance with the standards set up for participation.").

[26] *See* Mississippi High School Activities Association, http://www.misshsaa.com/about.aspx (last visited May 6, 2015):

The public and private schools that make up the MHSAA account for 94% of the total school population and because of this our Association realizes the tremendous responsibility we have to the people of Mississippi. The

10

eligibility decision that prevented *him* from playing high school sports. The decision of the chancery court is affirmed, and the case is remanded to the Chancery Court of DeSoto County for proceedings consistent with this opinion.

¶21.   **AFFIRMED AND REMANDED**.

**KITCHENS, CHANDLER, KING AND COLEMAN, JJ., CONCUR. RANDOLPH, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., LAMAR AND PIERCE, JJ. PIERCE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., RANDOLPH, P.J., AND LAMAR, J.**

**RANDOLPH, PRESIDING JUSTICE, DISSENTING:**

¶22.   Today's holding is breathtaking in its reach. (Maj. Op. ¶ 1). As written, it grants standing for high school athletes to challenge eligibility decisions, such as being declared ineligible for a game or games because of missed curfews or being dismissed from the team for smoking in the boys' room. One does not have to be a jurist to appreciate that there must be penalties, including loss of eligibility, if rules are broken.

¶23.   Today's analysis presupposes the existence of a contract, a critical point not developed by the majority or in ***Mississippi High School Activities Association, Inc. v. Farris***, 501 So.

---

> Mississippi High School Activities Association and the activities it sponsors are often called "the other half of education," when, in fact, we are much more than that. Surveys have shown that *students* who participate in extracurricular activities stay in school and achieve to a higher degree academically than those who do not participate. Surveys also show that these same *students* develop high moral fiber and that their values are molded in such a way that they are truly the good citizens that make this country great. Because of this proven importance of activities to a *student's* education, our Association cannot be just "the other half." Activities are instead an integral part of any quality educational program.

(Emphasis added.)

11

2d 393 (Miss. 1987). The issue as presented in *Farris* was "were the minor appellees third party beneficiaries to the contract between Hattiesburg High School and MHSAA." *Id.* at 395. The *Farris* Court analyzed that issue, as presented, as if the handbook of the Mississippi High School Activities Association (MHSAA) was a contract; however, the Court never determined as a matter of law that the handbook was, in fact, a contract.[27] *Id.* at 396. The majority, again reaching far beyond the scope of this case, fast-forwards to a determination that a contract exists, without support for its conclusion.

¶24.    Then, after citing *Farris* to buttress the contractual argument, the majority disassociates itself from the holding in *Farris*. In *Farris*, the chancellor held that "[a] contract existed between Hattiesburg High School and the MHSAA and the minor plaintiffs had standing as third party beneficiaries to bring this suit." *Id.* at 395. That issue is the exact issue before this Court today – do student athletes and their parents have standing as third-party beneficiaries to file suit? The majority lists numerous benefits that apply to the students to support its finding that the students are third-party beneficiaries. (Maj. Op. ¶ 16-17). I, just as the *Farris* court, recognize that students receive some benefit; however, those benefits are incidental benefits, not direct benefits. *Id.* at 396.

¶25.    If we honor *stare decisis*, the *Farris* holding controls this case. The *Farris* court held that "the chancellor erred in finding the plaintiffs/appellees were third party beneficiaries . . . ." *Id.* The *Farris* court further held that the student athletes and parents "had no property

---

[27] The only person who declared that the handbook was a contract was the chancellor.

interests in playing interscholastic sports" and were in no position to implement third-party standing. *Id.* at 398. I cannot ignore this precedent.

**WALLER, C.J., LAMAR AND PIERCE, JJ., JOIN THIS OPINION.**

**PIERCE, JUSTICE, DISSENTING:**

¶26. I dissent from the majority's holding that R.T. has standing to challenge the eligibility decision of the Mississippi High School Athletic Association (MHSAA) in this instance. At the outset, the majority's statement that the DeSoto County School District entered into a contract with MHSAA to allow MHSAA to decide whether its students are eligible to play high school sports is inaccurate. Apart from having no such signed instrument in the record before us, this statement misleads the reader as to what the MHSAA actually constitutes. MHSAA "is a private, voluntary nonprofit organization for public, private and parochial secondary schools that *choose to join and participate in the organization*." (Emphasis added.) Each member school adopts the rules and interpretations contained in the MHSAA handbook. The rules and interpretations are developed by member school representatives to promote fairness in competition for the student athletes and to promote the general welfare of member schools in their relations with each other. In no way have MHSAA and its member schools conferred any "right(s)" upon students to compete or participate in athletic competitions. As this Court recognized in *National Collegiate Athletic Association. v. Gillard*, 352 So. 2d 1072 (Miss. 1977), *Mississippi High School Activities Association, Inc. v. Farris*, 501 So. 2d 393 (Miss. 1987), and *Mississippi High School Activities Association, Inc. v. Coleman*, 631 So. 2d 768, 774 (Miss. 1994), students have no "right" or entitlement

13

to participate in athletics as part of a public education. Rather, students are allowed the privilege to participate in athletics. And this "privilege . . . may be claimed only in accordance with the standards set up for participation." *NCAA v. Gillard*, 352 So. 2d 1072, 1081 (Miss. 1977) (quoting *Scott v. Kilpratick*, 286 Ala. 129, 237 So. 2d 652 (1970)).

¶27. Here, the standards set up for participation are developed by the member schools through member school representatives, which, I say again, form MHSAA. To this end, MHSAA regulates the standards of eligibility for students who choose to or attempt to play on athletic teams of its member schools.

¶28. One of the eligibility requirements instituted is that a student must attend school in the school district in which the student's parent(s) are bona-fide residents. The purpose of this rule is to deter athletically motivated transfers and recruitment of students and promote fair competition among the member schools, keeping in mind the educational principle that participation in athletics is a privilege which should not take a dominant role over academics. *MHSAA v. Coleman*, 631 So. 2d 768, 777-78 (Miss. 1994).[28] If a school violates the rules it adopted by allowing a student who has been declared ineligible to participate in any

---

[28] In *Coleman*, we explained the following:

> The stated purposes of the anti-recruitment regulation, to encourage and promote fair competition among the schools and to deter odious recruitment tactics, are legitimate. Requiring that a student attend a school located within the school district in which that student resides, before the student may participate in interscholastic athletic competitions, is rationally related to the state's legitimate purpose. A classification scheme based on bona fide residence will clearly deter overzealous recruiting practices.

*Coleman*, 631 So. 2d at 777-78.

interscholastic contest, the school will be sanctioned by its fellow members through MHSAA. To be sure, MHSAA also has a rule that, even if a school obtains a court order enjoining the MHSAA from making an eligibility ruling, the school will be sanctioned in the event such order is reversed or determined to be unjustified. This provision is necessary to assure that MHSAA's antirecruitment regulations will not be rendered pointless by gamesmanship played in the courts, through use of injunctions and the like.

¶29. In reaching the conclusion that R.T. has standing to challenge MHSAA's eligibility decision in this instance, the majority fails to mention that the chancery court merely found that the Trails "have the right to have the court, following a trial on the merits, determine whether MHSAA wrongly decided to revoke R.T.'s eligibility and/or failed to properly consider applying an undue hardship exception to the residency requirements under the circumstances of this case." I can only assume that, in affirming the chancery court's decision, the majority is presuming that will occur. But why would the Trails pursue the matter to resolution? R.T. is now playing college football, and he actually left Olive Branch after his junior season to return to his high school in Arkansas. Why would he now seek a judicial determination as to whether MHSAA wrongly decided to revoke his eligibility? The record does not indicate whether R.T. participated in Olive Branch's football program after the chancery court issued a preliminary injunction in this matter. Assuming he did, if the Trails drop their suit against MHSAA, MHSAA's ineligibility ruling still stands, and pursuant to Section 4.6 of the MHSAA rule book, sanctions against Olive Branch will be implemented. But if, on the other hand, the Olive Branch football program, taking the

15

"team" concept into consideration, did not allow R.T. to participate while this suit was pending, then sanctions will not be forthcoming.

¶30.  This illustrates quite plainly to me why the member schools did not intend for student athletes to be third-party beneficiaries to the internal operation of affairs of MHSAA. Though elementary, it must be pointed out that MHSAA has no capability whatsoever to physically restrain a student athlete from participating in interscholastic activities. The only enforcement power MHSAA has is the power to sanction for violations of its rules and regulations, which, again, the member schools through rotating school representatives institute.  To expect a student athlete who a member school allows to participate in interscholastic competition after being ruled ineligible to pursue a claim to a judicial determination for the benefit of a member school is absurd.

¶31.  In *Scott*, which this Court cited with approval in *Gillard*, the Alabama Supreme Court stated:

> If officials of a school desire to associate with other schools and prescribe conditions of eligibility for students who are to become members of the school's athletic teams, and the member schools vest final enforcement of the association's rules in boards of control, then a court should not interfere in such internal operation of the affairs of the association.

*Scott*, 237 So. 2d at 655 (citing *Tenn. Secondary Sch. Athletic Ass'n, et al. v. Cox, et al.*, 425 S.W.2d 597 (Tenn. 1968); *Morrison v. Roberts*, 183 Okla. 359, 82 P.2d 1023 (Okla. 1938); *Robinson v. Ill. High Sch. Ass'n*, 45 Ill. App. 2d 277, 195 N.E.2d 38 (Ill. App. 1963); *State ex rel. Ohio High Sch. Athletic Ass'n v. Judges of the Court of Common Pleas*, 173 Ohio St. 239, 181 N.E.2d 261 (Ohio 1962); *Sult v. Gilbert*, 148 Fla. 31, 3 So. 2d 729 (Fla.

16

1941); *State ex rel. Indiana High Sch. Athletic Ass'n v. Lawrence Circuit Court*, 240 Ind. 114, 162 N.E.2d 250 (Ind. 1959); *Starkey v. Board of Education of Davis County School District*, 14 Utah 2d 227, 381 P.2d 718 (Utah 1963)).  I agree with *Scott*.

¶32.    Again, students have no protected property interest or right to participate in athletics as part of a public education.  Rather, participation in athletics is a privilege, and "[the] privilege . . . may be claimed only in accordance with the standards set up for participation." *Gillard*, 352 So. 2d at 1081.  MHSAA's rules preclude student athletes and/or their parent(s) from either challenging an adverse eligibility determination or instituting a hardship determination.  Unless it can be shown that the member schools, through MHSAA, have no authority to institute such a policy, we are powerless to order MHSAA to facilitate otherwise.  Of course, rules cannot be instituted that contravene or infringe upon any constitutional or statutory right of a student, as provided by either federal or state law, and the MHSAA rule book safeguards that accordingly.  No such question, however, is presented in this instance.

¶33.    The majority's opinion leaves questions which cannot be answered given the reasoning used to reach its holding,  And, most disturbing, by elevating the privilege of participating in interscholastic athletics to a right, the majority creates the ability for a student athlete to contest *any* adverse decision that affects the student's playing status, whether it involves team rule violations or coaching decisions.

**WALLER, C.J., RANDOLPH, P.J., AND LAMAR, J., JOIN THIS OPINION.**

17